It is Smith v. Garland, case number 22-954. Any time you are ready.  Good morning, Your Honors, and may it please the Court. My name is Janelle Barbier, and I, along with my co-counsel, Mr. Safwan Siddiqui, and Professor Evangeline Abriel, represent the petitioner, Mr. Marlon Alonzo Smith. We'd like to reserve three minutes of our time for rebuttal, and my co-counsel and I will each argue for six minutes at this time. We respectfully request that the Court grant Mr. Smith's petition for relief from removal. Today, I will explain why the agency failed to prove Mr. Smith's removability, and then my co-counsel will explain why the agency erred in denying Mr. Smith relief under the Convention Against Torture. This Court's plenary review will show that the agency committed legal error in its removability determination for two reasons. First, the agency did not establish alienage because it relied solely on unauthenticated documents. And second, the agency did not establish deportability because it, again, relied solely on unauthenticated documents. Moreover, authentication is not a mere technicality. The Ninth Circuit has repeatedly held that it is required to comport with due process and is a salient constitutional prerequisite. Ms. Barbier, do you dispute the authenticity foundation for the FBI rap sheet? Yes, Your Honor, we do. Why? The FBI rap sheet was a copy, was a printout of a purported database, and under the regulation at 287.6a, any copy must be attested to by the legal custodian of records. It must be authenticated, but it can be a self-authenticating document, can it not, under 901? It appears to be a Federal Bureau of Investigation printout showing, A, that Smith is an alien, and, B, that he was convicted. Aren't those the two elements for removal? Your Honor, two responses to that. First, we maintain that the government must comply with its own regulation at 8 CFR 287.6a, which requires authentication by the legal custodian of records. Second point to Your Honor's question, the court has held in cases such as U.S. v. Estrada-El Liverito that under F.R.E. 901, it does not require personal knowledge of the document's creation, but whoever is attesting to this must demonstrate personal knowledge that the document was part of an official file. And because it was a naked document, the FBI rap sheet, with no attestation or no certification. So your position is that a document can never be self-authenticating? Not under the agency's regulations. Right, but can I, because you've stressed that several times, and we have a very lenient standard in this area, as you know, and we have not really required compliance with the agency's regulations. We've said you have to comply with some authentication procedure to be sure, but why, where have we ever said it has to be strict compliance with the agency's regs? Your Honor, it's true the court has not said that, and that is the main thrust of our argument, is that when the court first interpreted the regulation back in 1978 and 1981 in Iran v. INS, the regulation had permissive language. It stated that evidence may be evidenced by, but in 1985, the agency changed the language of the regulation. And has that change reflected anywhere in our case law? Not that we have found, Your Honor. I'm trying to figure out how that's possible. I agree. I can't find it either. Can you tell us whether this has been raised anywhere, this argument? We have tried and tried, Your Honor, and we have not found it, and we are baffled. Okay. And from our position, again, we have not found any case where the agency or any petitioner has pointed out the change. And from our perspective, the agency has continued to rely on Ninth Circuit cases such as Iran that were interpreting a different regulation. And unfortunately, our friends on the other side did not address our main argument as to the change in regulation and why the agency should not have to comply with its own regulation. But even if the regulation is not compulsory, the government did not authenticate its evidence by any permissible method. This is analogous to cases like Iran or also in Flores v. Sessions, which a panel in 2017 looked at an immigration form that actually had more evidence of certification than what we have here but yet held it wasn't sufficient for authentication purposes. And what we have here is the we're talking about the rap sheet. I guess in terms of the 2018 judgment, can you speak to whether that claim is exhausted? Certainly, Your Honor. So first, as we've detailed in our brief, Mr. Smith's counsel below did raise an argument to all documents at the immigration hearing. Both counsel below and the immigration judge referred to Exhibit 2 as Exhibit 2. Exhibit 2 contains three pieces of evidence. It would be the purported conviction records, the FBI rap sheet, and also the USCIS search results. Now, in her appeal to the board as well at pages 26 and 27 of the record, counsel below also stated that all documents in the government's supplemental filing were not authenticated and then spelled out again the regulation at 287.6. I think the trouble is before the immigration judge is that I think they also raised the two other documents but not the 2018 judgment. And so it's a little ambiguous whether that was preserved. We understand, Your Honor. But even putting that aside, our friends on the other side did point to a recent Supreme Court case and sent to Zachariah v. Garland. Now, that case, of course, held that the exhaustion requirement is not jurisdictional. But it also pertains to this case because the Supreme Court pointed out that when the BIA creates the error, that error does not need to be exhausted below. Here, the error is that the PACER documents alone are sufficient to prove a purported conviction. The IJ mentioned nothing of that sort. The BIA came in on page 4 of the record and stated that the conviction records established the conviction and did not mention any other evidence. So we maintain that it did not have to be exhausted because the BIA was the first entity to create the error. Your Honors, I do see my time is running low. Could you speak just briefly to what the due process claim adds to any holding that one or more of the documents were properly authenticated? Yes, Your Honor. So as in Iran v. INS, as in Flores v. Sessions, as in Perez-Cruz v. Barr, there are several cases that look at when improperly admitted evidence is excluded. Which here we maintain would be all of the government's evidence because none of it was authenticated properly. When that is excluded and there is no remaining evidence to prove either alienage or deportability, the case must be remanded with instructions to terminate because there is prejudice. In fact, I think Flores v. Sessions spelled this out very well, that when removing, after removing the improper evidence, there is no other properly authenticated evidence to prove removability. The government had its chance, yet failed to prove that Mr. Smith is removable. And for those reasons, the case should be terminated. If there are no further questions, thank you, Your Honors. Thank you. Good morning, Your Honors. Before I begin, we did have an unopposed motion. It's denied. It's denied. We don't typically allow visual aids. We're familiar with it. May we use this poster? No. May it please the Court, my name is Safwan Siddiqui. I will discuss the errors made by the immigration judge and the Board of Immigration Appeals in denying Mr. Smith's deferral. Counsel, I'm going to ask you, because we're in a marble room where the sound echoes and bounces around, if you could speak a little slower, it would help a lot. Yes. Yes, Your Honor. My name is Safwan Siddiqui. I will discuss the errors that were made by the immigration judge and the Board of Immigration Appeals in denying Mr. Smith's deferral from removal under the Conventions Against Torture. Should this court find that alienage and deportability were established, we ask the court to vacate and remand for two main reasons. First, the I.J. misapplied matter of JFF in treating Mr. Smith's risk of torture under the mental health claim as a single series of suppositions when it was not a single series of suppositions. And second, because the I.J. miscalculated Mr. Smith's mental health claim, the I.J. could not have properly aggregated Mr. Smith's risk of torture in the end. So to clarify, the I.J. identified three sources of mental health. Mr. Smith argued many different things could happen. The I.J. put them into three different categories, and to that extent, we don't have a problem. The categories were mental health, prior, I suppose, conviction, and the third was racial gang violence. Our issue in misapplying a matter of JFF is in that first category, is in that category of mental health. So I'd like to just explain JFF, and then I'd like to illuminate on how our cases differ from JFF. In the matter of JFF, the respondent argued that he would have been tortured after a specific series of events would have occurred. Those were the respondent needed medications in order to not break the law. The medication would not have been available in the Dominican Republic. The respondent would not have been able to control his behavior. The respondent would have been arrested as a result of not controlling his behavior, and the police would have tortured the respondent after arresting him. That was the claim in JFF, and that was a single series of suppositions. So the court held, the agency held, understandably, that each event in that series would need to be proven more likely than not in order to meet the cap burden. Our case is different. Mr. Smith also has a history, and I'd like to recognize and sympathize with Mr. Smith's history with struggling with mental illness, being institutionalized more than once, having a history of suicidality. These are all ñ this is why our case is so important. But Mr. Smith's claim does notó your assessment of what the I.J. did. But is there an incorrect statement of the standard that we see? I do seem to see the I.J. speaking to the aggregate risk as well as taking these separately. I guess if you can help me a little bit, are weóare you asking us simply toóthe I.J. didn't do what the I.J. said they were doing in terms of the legal standard? There are two parts to that question. First, yes, we think the I.J. used the wrong standard. And I'd just like to read the I.J.'s quote from page 62 of the AR. And this is at the end of the section on mental health. Accordingly, the court finds the respondent has not met his burden of establishing that each step in the proposed future chain of events is more likely than not to happen. And we think that's the wrong standard here, because there are several different series of events that are proposed and requiring more likely than not for A, more likely than not for B, Series B, more likely than not for Series C, and more likely than not for all of these different things. That raises the standard in the end to some other standard that's higher than more likely than not. And the second part to that question is, did the I.J. do what they said they did? In the end, when the I.J. says that they have properly aggregated, they've considered all the evidence and reached a conclusion in the aggregate, that is not mathematically possible, because in the I.J.'s proposed aggregation in the end, they included a miscalculated claim or a miscalculated risk on the basis of mental health. So now that mental health was wrongly calculated, it's not possible for there to have been a proper aggregation done in the end, because one-third of the analysis is already flawed. And further, I'd just like to illuminate why Mr. Smith's claim is based on several different proposed hypothetical events. There's a possibility that Mr. Smith is going to be tortured by the police, targeted on his mental health risk and tortured by the police. That's one possibility, and that's different from the possibility that, let's say, he is institutionalized in a psychiatric facility and tortured by other patients there. And I recognize my time is running low. I want to save time for rebuttal. So if Your Honor, yes, Your Honor. I guess just one question on there, trying to figure out what it is, what more the I.J. could have done in this case. The I.J. does address each of these pieces of evidence. It may not cite as much of it as you have proffered. But are you suggesting that in order to properly conduct the analysis, the I.J. has to do something like a flowchart where it works through every permutation of the possibilities of leading to some potential for, more likely than not, for torture? Your Honor, the I.J. I suppose you could frame it that way. I'm not a mathematician. I don't know if the I.J. is a mathematician. Maybe they are. But ultimately, the I.J. should not have applied JFF and required that each step be proven more likely than not. Because let's say you have five hypothetical chains of events. In the end, the requirement is you prove more likely than not. By requiring each one be proven more likely than not, like a 51%, 51%, 51%, 51%, by requiring that as opposed to, let's say, 49%, 49%, 49%, in the end you could reach a conclusion, an end result that's more likely than not based on five different chains that are 49%. I'm not a mathematician, so I can't verify that. But the point is, and what the Court held in Velasquez-Sanmayoa, is that with different theories, not necessarily each of them need to be proven more likely than not. Disjunctively, the fact that any of these, this, this, this, or this could occur in its whole, that be proven or not is a different analysis. Thank you, counsel. Thank you. We'll put two minutes on the clock when whoever comes back for rebuttal. We'll hear from opposing counsel, please. Good morning, Your Honors. May it please the Court, my name is Robert Coleman. I represent the Attorney General. I'll start to attempt to clarify the issue regarding 287.6 and this change in the law that occurred in 1985. According to the regulation itself, that change in 1985 was done to make a change to the foreign documents section of the law. There was a change made to that section. And the change was, I believe, not even submitted for the typical rulemaking procedures because it solely pertained to foreign documents. There was, however, it seems, a change from may to shall to the domestic documents. But I don't know if that was a mistake or if that was just changing the word but without any difference. As the Supreme Court has noted. It was between may and shall, as you know. And so that's why it's so curious. It is, but that's the consistent way to read that with this Court's some 40-odd years of case law. Well, that or the Court's wrong or no one's argued it or called it our attention to it. I don't know, but I'm just very clear that I can't find any indication that we've ever addressed this. I agree. I don't think this Court has addressed that specific issue. But the Supreme Court has noted that shall sometimes does mean may, in fact, confusingly, admittedly. But that is sometimes the case. Is that your position here, that we should read that to mean may? Yes, because the Court has read it to mean may already to the extent that it's ruled on the issue of applicability of 287.6. Which is not at all. We haven't ruled on it. I think that's what you're telling us and that's what opposing counsel is telling us. Yes, this specific argument. However, the applicability of 287.6 has been weighed in on by this Court numerous times. Well, our problem, I'm not trying to belabor the point, but our problem is that we have case law that says that we're pretty lax, really, when it comes to authenticating documents and immigration proceedings. Right. But we have to look to see to make sure that minimum due process is satisfied. And we've said you have to follow some procedure. It might be the rule of evidence. You know this case law very well. Right. So the problem is just the collision between that, between us saying, well, you can use various methods, and then not, I'll say, updating, not revisiting that after we have this change in regulation. And so the government's best response is, I think we haven't turned back and ever been asked, or that I can see, been asked to directly address this. Is your response that we should treat that shall as a may? Yes, because that was not only is it consistent with the case law in the past, but also because of, as I said, the regulation itself does not indicate that any explicit change was being made or much less intended to be made for the public documents, the domestic version of the public documents. But more than that, because requiring some heightened level of authentication in immigration proceedings, whereas FRE 901 could be complied within a criminal proceeding, if the court were to accept Smith's version of the argument here, then this court would be essentially clarifying that documents that could be authenticated in criminal court can't be in immigration court because there's a heightened standard in immigration court, which flips the whole notion of administrative law having eased burdens on its head. So is your position that the I-213 was properly authenticated? Yes, because there was, it was properly admitted. It was not, there was no formal authentication procedure adhered to because there was no authentication objection. There was an objection as to the reliability of the document. There was some comment as to the contents of the document, which were then addressed later, namely the Smith's mental health condition. But there was no explicit authentication argument made. There was no objection saying this document isn't authentic or this document is not what it purports to be, which is ultimately what an authentication procedure is. So that's why there was no formalized procedure. There was an objection and a continuance granted. Isn't that right, so that the government could get its documents together? Yes, there was an initial period of time granted to the government to provide documents to establish the Smith's removability, yes. Right, and then there's an objection in the transcript that I recall. Forgive me for paraphrasing, but it's an objection to the extent of we're going to hold the government to its burden, that they were going to insist that the government jump through all the hoops. I don't mean to be disparaging, but jump through the formalistic, which in many cases are very formalistic hoops, right? No, not in immigration proceedings. We've got to comply with something in immigration proceedings is my point, and we've been very lax setting aside the regulation, which I still don't understand how that's possible, but that's what we've done. We've been very lax, but their argument is you still have to comply with something. So I'm trying to figure out for the I-213 in specific, how was it properly authenticated, or is it your position that you didn't have to properly authenticate it? It is my position that they didn't have to properly authenticate it because no authentication argument was made then. There is one now, of course, but there was no argument made to that point then. Thank you. You're welcome. Could it make a difference in our cases where we have relaxed the standard in Iran and some of the subsequent cases, including those that post-date the new regulation, that where due process is underpinning the analysis, only the petitioner is facing a deprivation of liberty, where the government might be held to stick with the rules that it sets forward? I understand that logic, Your Honor, but as recently as earlier this year in Gomez-Osario, the court clarified that DHS can sufficiently authenticate a document by, for instance, complying with FRE 901. So that's the government specifically being the movement in that case. Okay. Thank you for that. On the minimum baseline, I think it's a concession that the government didn't authenticate. Your argument is really that there wasn't a proper objection. But where do you view the bare minimum here? Is it 901? We've talked about common law rules of evidence. I haven't seen any of those. What was the bare minimum, if this is remanded, that the BIA would have to find or the IJ would have to find this met to introduce 5213? The bare minimum comes from FRE 901, 901A specifically, which only requires that the document appear to be what it or sufficient evidence be put forward to show that the document is what it purports to be or what the movement purports it to be. And in FRE 901B, the rules set out examples of how that could be accomplished. B4 seems most applicable here because that relies on the document, the characteristics of the document. That could have all been accomplished here. And so for that reason, even if the court were to find that there was some error in not engaging in a more formalized authentication procedure, despite the lack of objection, it still would have been authenticated under that. How does that not conflate 901 and 902? I think Judge Baya talked about the idea of the other document being self-authenticating. What else other than I213 itself is the plus factor that would allow it to be authenticated under 901? Well, here, because there was no objection made as to authentication, nothing further was provided other than just the I213 itself. There was a continuance, so the government could use it. The continuance was not after the objection was made. There was no objection as to authentication. The continuance was because the government had no evidence regarding removability at first, and Smith said, I contest removability at the outset, at least I deny the factual assertions from the NTA. The continuance was granted for that. So that continuance wasn't really granted for this purpose, and there really was no objection to the authentication procedures. So additional evidence could have been put forth, or a certification, the same type that was put forth for the PACER documents, could have been done here if there was an issue with that. However, this document comes from DHS itself, unlike the PACER documents, and so the understanding was this is DHS providing a document authored by DHS, and there's no assertion that it's anything other than that. But isn't exactly the question. I mean, that's what authentication is about. There was no evidence other than the lawyer's own say-so, which typically is an evidence that this was from a chain of custody that began with DHS. Right, but there was no assertion made to contest that point. So this is – Well, there is. There's at 94, a record at 94. We object to the admission of the I-213 as the I-213 in terms of the record obtained and did not state a reliable source of how they obtained the evidence of the respondent's deportability. In other words, it seems to me that goes straight to the fact that the opposing party is the one that has generated this document, and so they want to know why they should treat it as authentic and reliable. Right, and so reliable and authentic are different points. So reliability. I agree, but they've also made, as we discussed earlier, we're holding the government to its record or to its burden, and you're certainly not denying that authentication is typically required. So what's missing, that they didn't use the word we object on the grounds of authenticity? No, they didn't have to use that word, but the notion of authenticity is, is the document what it purports to be? Is this actually an I-213 form? And there was no assertion that this is not an I-213 form. Well, is that really what you're? It has to be an I-213 form that actually records the information received from him, right? It depends on what is said in the document, as far as any assertions as to where the information came from. It could come from different sources. At this point in the record, whether these broad objections made, I have to look at this chronologically to figure out whether or not it was already discovered and were they already discussing that there was this odd entry about birthplace in Wisconsin. And that's in a different document. Right, but I'm trying to figure out if, chronologically, had that already been aired? That was at the same time there was an argument being made as to that, as to the FRA, that's the FBI rap sheet. Right, so there's a conflict between the documents that the parties were aware of at this point in the proceeding? Yes, although there was no argument about it being a conflict between documents. It was simply the rap sheet was objected to on other grounds, which was that it contains this notation that Smith was born in Wisconsin. And the assertion made was that either that should be, that the entire document should be excluded, the rap sheet, that is, or if it's admitted that proceedings should terminate automatically because it has a notation as to his birthplace being Wisconsin, although it contained notations of his birthplace being in Guyana as well. I think we're just talking past each other. I appreciate that it's a different document and it's got a different problem, but my question really went to whether or not the parties were aware. It sounds like they were aware at the time they were discussing the I-213 that there was another document in the record that raised a different birthplace. And 213 should record what the defendant, the information the petitioner provided, correct? Correct. It contains biographical information as well as information obtained from Smith. Purportedly obtained from the petitioner. Correct, and he never went on to make any argument when, because of course proceedings ended up continuing on because all objections were overruled. There was no later argument that the information didn't actually come from ICE or from DHS, so that was never developed further. What about on the 2018 judgment? I think there's some suggestion now turning from citizenship to the conviction and removability. Is that, do you rely on that to establish the conviction? Because I think there's some sense in your brief that maybe you don't because the conviction, well, if you had maybe a secret decoder ring you could look at it on the copy. It's not all that clear. Correct, Your Honor. We don't rely on the document from Pacer to establish the criminal conviction because that information is in the other documents, namely the I-213, which does state the crime and the punishment as well. So this supplements that information. What else do you have on that other than the I-213? The FBI RAPTCHE and the CIS report. All of the information submitted showed that he committed this crime. Then we also have testimony that came in after, that's admittedly after he was found removable, but the testimony clarified that he did commit the crime that he was convicted of. He testified remotely, in fact, from a federal facility where he was serving out his sentence, 15-year criminal sentence. Are you relying on his testimony? No, it just goes to show that there is no actual contest as to the fundamental underlying facts here. Can you speak a second on the question of remand, if we were to remand? The petitioner seeks termination of removal proceedings. What's your view of the proper instruction on remand? On remand, it would be just for this court to instruct the agency to evaluate whether or not this evidence could be authenticated or not. It should not be terminated, as was the case in Flores, because in Flores there was an authentication objection to the document and a motion to terminate, I believe, on that basis. And so that case is distinguishable from this for that reason. I see I'm over the time. I did not address the Catt claim. If the court has any questions about that, I would be happy to answer those. It doesn't appear that we do. Thank you very much. I appreciate it. Thank you. There will be two minutes on the clock. Thank you. Thank you. There are several points I'd like to make. I'll try to get in at least three here. First off, right off the bat, a respondent here argues today that the change in regulation in 1985 was perhaps a mistake or doesn't know how it occurred. None of this information was raised in the brief. Moving on, related to that, this is the first time today we're hearing that Mr. Smith did not raise an authentication objection specifically to the I-213. To be sure, counsel has maintained, on the other side has maintained, that the PACER document objection was not exhausted, but there was nothing on the I-213. And, in fact, as Your Honors pointed out, at the hearing in front of the IJ, pages 93 to 95 in the record, Mr. Smith's counsel below did cite the regulation at 287.6, did object to authenticity, and, in fact, was met with repeated connection issues as she was trying to get through all of her objections. And this is another reason why it's especially salient. She had then the opportunity to spell everything out in her brief to the Board, again, at pages 26 and 27 of the record, where she clearly objected to authenticity of every document and spelled out the regulation. To Judge Johnstone's question about a bare minimum, in 1962, this is prior to any authentication regulations established by the agency, the Ninth Circuit held in Chu v. Boyd that whatever method is used requires, quote, assurance that the attesting officer had actual custody of the original record, which goes to my point that every bit of evidence presented by the government in this case was a copy with no indication that there was any possession of the original records. And finally, as Respondent brings up and also concedes, any testimony given by Petitioner at CAT is completely separate from removal and cannot be used under the removal statute. If there are no further questions, I thank you, Your Honors. Thank you. Thank you all for your arguments. Very helpful. That concludes our arguments for today. We'll stand in recess.
judges: BEA, CHRISTEN, JOHNSTONE